BARRON COUNTY CANNING & PICKLE COMPANY, Appellant,
vs. NIANA PURE FOOD COMPANY, Respondent.

*December 10, 1926—January 11, 1927.*

*Food: Peas packed under specifications complying with federal Pure Food Act: Excess quantity of brine: Cancellation of future deliveries by purchaser of entire pack: Peas packed under supervision of purchaser: Acceptance.*

1. Brine in cans of peas in excess of the amount sufficient to preserve them constitutes "adulteration" within the meaning of the federal Pure Food and Drugs Act.  p. 641.
2. So, also, the packing of not over twelve ounces of peas in thirteen and one-half ounce cans, with more than enough brine to cover them, constitutes "adulteration."  p. 641.
3. Where the seller did not protest the buyer's charge that the cans of peas were, according to government regulations, slack filled, and did not offer to fill future cans in a different way, but in-

sisted that the buyer take them as then being filled, the buyer was justified in canceling the contract, which guaranteed compliance with the federal Pure Food and Drugs Act, and in declining to receive future deliveries thereunder.    p. 641.

4. The buyer's acceptance of a partial delivery of peas packed under the supervision of its representative is not a waiver of its right to cancel the contract for future breaches by delivery of slack-filled cans.    p. 641.

5. The evidence in this case is *held* to show that defendant's agent, under whose supervision the peas delivered were packed by plaintiff, represented defendant in all matters pertaining to the packing, including observation of the filling of the cans.    p. 643.

6. The peas packed by the seller under the supervision of the buyer's accredited agent and stored in a warehouse are *held* to have been accepted by the buyer, in view of the contract provision that peas graded by him and stored in a warehouse were to be accepted by the buyer as graded and stored.    p. 644.

APPEAL from a judgment of the circuit court for Barron county: W. R. FOLEY, Circuit Judge:    *Affirmed*.

This is an action to recover damages for the breach of a contract for the purchase of peas.    The plaintiff owns and operates a pea-canning factory at Chetek, Wisconsin.    The defendant is a dealer in canned peas with its principal offices and place of business at Waukesha, Wisconsin.    On February 14, 1924, plaintiff and defendant entered into a written contract by which plaintiff agreed to sell and defendant agreed to purchase plaintiff's entire pack of peas for the season of 1924, pod run or ungraded as to size, at prices therein specified.    By the terms of the contract the seller warranted and guaranteed that the goods to be delivered under the contract would comply with the federal Pure Food and Drugs Act of June 30, 1906, and should not be in any manner adulterated, or misbranded, except such part, if any, as may be shipped under labels furnished by the buyer, in which case it was understood and agreed that the guaranty as to misbranding was null and void.    It was further agreed that the buyer would keep an agent at the factory during the first days of packing until at least 8,000 cases were in the ware-

house, "said agent to grade the entire pack of peas packed under this contract into the warehouse, and peas so graded and stored in warehouse to be accepted by buyer as graded and stored. Such agent to grade balance of all peas not less often than once per week until pack is completed."

The factory started packing peas for the defendant on July 22, 1924. Under and pursuant to the terms of the contract requiring a buyer to keep agent at factory during the first eight days of the pack, the defendant sent one W. A. Christensen to Chetek to supervise the packing of the peas. It seems that these peas were going out under the Niana label, and in order to have those peas conform to peas packed in other plants under that label it was necessary that they be processed in the Niana way. Christensen remained at the plant some seven or eight days, gave instructions with reference to the processing of the peas, kept close watch of the work as it progressed, made frequent tests and observations, and took note of the fill of the cans until 8,963 cases had been packed and stored in the warehouse.

It appears that at about the time Christensen was leaving, a representative of the company named Potts was sent to the factory to re-grade the peas, a dispute concerning the grade having arisen between plaintiff and Christensen. While he was there he observed the fill of the cans and claimed the cans were slack filled. Upon his return to Waukesha he took with him a number of the cans then packed, which were opened by the defendant. The defendant then wired the plaintiff to send it a full case representing each date of pack. After opening and examining these cans, on August 4, 1924, the defendant wrote plaintiff as follows:

"When our Mr. Potts returned from Chetek on Thursday last, he brought with him two cans each of your pack of Ungraded Sweets of July 22d to 29th inclusive. We cut these samples immediately and found them so slack filled that we did not believe they could possibly represent your entire

pack. We accordingly wired you to send us a full case representing each date. These peas arrived this afternoon. They were cut at once, drained and weighed, and every can was found to be so slack filled as to render their sale illegal. We therefore reject the entire stock and will not accept any portion of your pack as a delivery on the contract existing between us, and have wired you accordingly as per inclosed confirmation."

To this letter the plaintiff replied protesting against the cancellation of the contract and advised that the plaintiff would hold defendant for damages. Nothing was said, however, as to whether or not plaintiff regarded the cans as slack filled, and made no suggestion or offer to fill cans differently for future delivery. In reply to this letter defendant wrote saying, among other things:

"Your tender of illegal goods has breached the contract and we will absolutely accept nothing under contract. We will, however, accept and pay for at the contract price, every case of goods of satisfactory fill and quality which you have already packed or can pack for us."

In reply to this plaintiff wrote saying:

"We can add nothing further to our letter of August 7th wherein we advised you exactly what we intended to do. Permit us to say that we are now proceeding under that plan, and we are selling the goods as fast as possible at the best price obtainable, and will hold you for the loss, if any, that we may sustain through your failure to fulfil your contract."

Plaintiff then proceeded to sell its pack of peas for such prices as it could obtain therefor, and defendant went into the market and purchased peas to take the place of peas which it was to receive under the contract at prices which it found necessary to pay.

The plaintiff brought this action to recover its alleged damages resulting from the refusal of the defendant to accept its pack of peas under the contract and to recover the value of the peas which were packed under the supervision

of Christensen and stored in the warehouse, claiming that these peas had been accepted by the defendant. The defendant counterclaimed for damages representing the difference between the contract price and that which it was required to pay for peas purchased to replace the peas to which it was entitled under the contract.

The case was tried before a jury, and a special verdict was returned, wherein it was found that the cans were not slack filled, that the plaintiff used reasonable efforts to sell the pack at highest price obtainable in the market after the rejection of the peas by the defendant. It also found the value of various grades of peas, which will be dealt with in detail as may be necessary in the opinion.

The court changed the answer of the jury to the first question, by which it was found that the plaintiff put as large a quantity of peas in each can as could reasonably be, done, from Yes to No. In an opinion the trial judge expressed his views with reference to the case, which may be epitomized as follows: The cans were slack filled to such an extent as to constitute a violation of the Pure Food and Drugs Act; there was no offer on the part of the plaintiff to fill future cans in a manner to comply with that act. The defendant was justified in breaching the contract so far as future deliveries were concerned. The peas packed under the supervision of Christensen and stored in the warehouse were accepted by the defendant, and for those peas the defendant must pay; that the defendant did not use reasonable efforts to purchase at the lowest price obtainable in the market peas for those contracted to be furnished by the plaintiff, and, consequently, it could recover no damages under its counterclaim. Plaintiff was awarded judgment for the contract price of the peas packed under the supervision of Christensen and stored in the warehouse. From this judgment plaintiff appealed, and defendant gave notice of review,

under sec. 274.12, Stats., of that portion of the judgment and rulings of the court adverse to it.

For the appellant there were briefs by *Farr & MacLeod* of Eau Claire, and oral argument by *Arthur W. MacLeod*.

For the respondent there was a brief by *Jacobson & Malone* of Waukesha, and oral argument by *M. A. Jacobson*.

OWEN, J. The question of ranking importance is whether the defendant was entitled to cancel the contract because the cans were slack filled. By the terms of the contract the plaintiff guaranteed that the peas to be delivered under the contract would comply with the Pure Food and Drugs Act and should not be in any manner adulterated. The Pure Food and Drugs Act prohibits the adulteration of foods. That act provides that foods shall be deemed to be adulterated "if any inferior or cheaper substance or substances have been substituted wholly or in part for it." The presence of brine is necessary in canned peas. In view of the fact that brine is cheaper than peas, it is apparent that great fraud could be perpetrated if the canner were under no restrictions as to the amount of brine that might be introduced into the can. Manifestly there should be sufficient to preserve the peas. Manifestly, also, brine in excess of such an amount constitutes an adulteration. The evidence in this case shows that the brine should be just sufficient to cover the top of the peas. The undisputed evidence shows that the brine in the cans packed by plaintiff under this contract was much greater in amount. The evidence on the part of the defendant shows that the brine covered the peas as much as an inch. The evidence further shows that the federal regulations require such cans to contain thirteen and one-half ounces of peas drained weight. According to the testimony of the plaintiff company the cans did not contain in excess of twelve ounces drained weight, while there is testimony on the part of the defendant to the effect that some cans did not contain

more than eleven and one-half ounces drained weight. The president of the plaintiff company frankly admitted on the stand that the cans were slack filled according to government regulations. A can which contains but twelve ounces of peas contains less than ninety per cent. of the food substance which not only may be, but ordinarily is, present in a properly packed can of peas of the size here under consideration. This must constitute adulteration under the Pure Food and Drugs Act.

A number of cases, statements of which have been issued by the department of agriculture from time to time, in which convictions have been obtained under the Pure Food and Drugs Act for adulteration or misbranding because of the presence of excessive brine in canned foods, have been called to our attention by the attorney for the defendant. In one such case a conviction was obtained where the label declared the contents to be six pounds and twelve ounces, while an examination of twenty-four cans showed an average net weight of six pounds nine and seven-tenths ounces. Whatever weight should be accorded these cases, they give reassurance to the conclusion that the presence of excessive brine in the cans packed by the plaintiff under this contract constituted an adulteration and a violation of the Pure Food and Drugs Act.

In view of the fact that the plaintiff, when attention was called to the slack fill of the cans, did not protest the charge and did not offer to fill future cans in any different way, but insisted that defendant should take the cans as they were then being filled, it seems clear that the defendant was justified in canceling the contract and in declining to receive any future deliveries thereunder. Davidor v. Bradford, 129 Wis. 524, 109 N. W. 576. The fact that defendant had accepted partial delivery, as hereinafter determined, did not constitute a waiver of its right to cancel the contract for future breaches. 24 Ruling Case Law, p. 286, § 566.

We now come to a consideration of the question whether the defendant had accepted the peas packed under the supervision of Christensen and stored in the warehouse of the plaintiff. The contract provides:

"Buyer to keep agent at factory during first days of pack, until at least 8,000 cases are in warehouse. Said agent to grade the entire pack of peas packed under this contract into the warehouse, and peas so graded and stored in warehouse to be accepted by buyer as graded and stored."

The reason for this provision seems to have been, first, that the plaintiff had had no experience in packing pod-run peas or peas ungraded as to size; second, that these peas were to go out under the Niana label, which required that they be processed in the same manner that peas bought from and processed in other factories were packed for the Niana label. For the purpose of complying with this provision of the contract, the defendant sent Christensen to Chetek to supervise the packing of the first 8,000 cases of peas. He did supervise the packing of 8,963 cases of peas and these were stored in the warehouse of plaintiff. Under the terms of the contract this would seem to constitute an acceptance of the peas. Defendant contends otherwise, because, it says, Christensen had nothing to do with the filling of the cans and had no authority to bind defendant in this respect as its agent. There is nothing very substantial to this contention. It is probably true that the presence of Christensen was due to the inexperience of the plaintiff in packing pod-run peas, and the further fact that the peas were to be packed according to the Niana process. The president of the defendant company testified that Christensen was to see to it "that these peas would be packed as peas should be packed for our labels." He further testified:

"I didn't have to give him a long drawn-out specific instruction. This man had packed peas for the Niana label

for a number of years. My instructions were very brief to him, indeed. I told him that these people, as nearly as I understood it, had never packed ungraded peas before. I told him, 'Now, Bill, you go up and show them how to pack them.' That meant to me that he would inform and instruct the superintendent of the Chetek plant as to how to handle his raw stock. That would be the green peas, before cooking; and how to handle the processing; as we speak of it, that operation of processing covers the whole thing, of course. Cooking of the peas in the can; and it would mean the blanching of the peas, which is the most important phase of the whole process, so as to permit those people to pack in their plant, peas that would match the peas that were packed in other plants for our label. The blanching was one of the most important things we had to watch. . . . He would naturally watch the time and temperature at which the stuff was cooked, so that we would be assured that the stuff would keep after it came out of the retorts. He would watch the cooling after they came out of the retorts, because, unless they are promptly cooled, the liquor is cloudy. And he would watch the flavor of the liquor, *and he would watch the fill of the cans.* That would require him to be over the whole plant during the process. All around, from time to time. He would be a free lance around the plant; nose into anything that wasn't going just exactly right."

And again he testified:

"If he found the cans were slack filled, I would expect him as our representative of this plant to call their attention to it."

This testimony shows that Christensen was present as the representative of the company with general powers to see that the peas were properly packed. While probably he would not have been there for the limited and express purpose of observing the fill of the cans, that does not change the fact that, being there charged with such a general responsibility, he did represent the defendant in all matters pertaining to the packing of the peas. In view of the express pro-

vision of the contract that peas graded and stored in the warehouse are to be accepted by the buyer as graded and stored, there is very little substance in the claim that the 8,963 cases of peas packed under the watchful supervision of defendant's accredited agent and stored in the warehouse were not accepted by the defendant. We have very little difficulty in affirming the conclusion of the trial court on this branch of the case.

We now come to a consideration of the defendant's counterclaim. The jury found, by its answer to question 4 of the special verdict, that the defendant did not use reasonable efforts to purchase at the lowest price obtainable in the market peas contracted to be furnished by plaintiff. The court, in disposing of defendant's counterclaim, said:

"Referring particularly to the answer to question 4, I think that in view of all the testimony as to the market value of peas, and in view of the way peas were purchased by the defendant from factories in which the president of defendant had some interest, or over which he exercised more or less control, the situation was such that the jury might well find that the defendant did not use reasonable efforts to purchase peas at the lowest price obtainable in the market."

While there is much evidence to support a different answer to question 4, we cannot say that the answer returned finds no support in the evidence. That matter was evidently given careful consideration by the trial judge, who felt that the answer should not be disturbed. We have carefully examined the record upon this question, and we do not feel warranted in saying that the verdict finds no support in the evidence, and therefore the answer to question 4 should stand. From this it follows that the defendant is not entitled to recover on its counterclaim.

*By the Court.*—Judgment affirmed.